## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 03-10383-RGS** |
| | ) | |
| **JULIO FRANCO et al.** | ) | |
| **Defendants.** | ) | |

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS SANTIAGO'S AND VEGA'S MOTIONS TO SUPPRESS EVIDENCE

The United States of America, through undersigned counsel, respectfully submits this memorandum of law in opposition to defendant Jose Santiago's Memorandum in Support of Motion to Suppress Evidence, submitted on May 3, 2004, and defendant Domingo Vega's Motion to Suppress Fruits of Illegal Search and Seizure and Statements Obtained Therefrom, dated May 3, 2004.

Santiago moves to suppress the approximately $529,000 in cash seized from beneath the rear passenger seat of the Volkswagon Jetta he was driving on November 9, 2003. He contends that the stop was illegal because the car was allegedly stopped by a Massachusetts State Trooper in Rhode Island, where Santiago contends the Trooper lacked jurisdiction to effect the stop. He further argues that the officers lacked probable cause to make the stop.

Vega moves to suppress personal papers, four credit cards, a cellular telephone and pager, as well as any other evidence observed or seized pursuant to the warrantless stop, search and seizure of his person and the car which he was driving in Massachusetts on November 9, 2003. Vega argues that the police

lacked probable cause to effect the stop, search and seizure.

As discussed in more detail below, both defendants' motions are baseless.   The Jetta driven by Santiago was stopped by a DEA Special Agent based in Rhode Island, assisted by members of a Massachusetts based DEA Task Force, all of whom were either DEA agents or deputized DEA agents, with the authority to make arrests and seizures throughout the United States.

Secondly, there was ample probable cause to stop, search and seize both the Jetta and the Audi, and arrest Santiago and Vega, based on court-authorized intercepted telephone conversations during which the defendants and their coconspirators made arrangements to collect and  transport over $700,000 in cash, in two planned trips, from Massachusetts to Providence, Rhode Island, in order to purchase a substantial quantity of cocaine, combined with the agents surveillance of the defendants as they drove down to Rhode Island and back after their aborted effort to obtain the cocaine, as well as prior seizures of cocaine arising from the investigation.

## SUMMARY OF FACTS

The facts supporting the stop, search and seizure of the Jetta and Audi are set forth in more detail in the complaint affidavit of DEA Special Agent Mark Tully, attached hereto as Exhibit A, and in the excerpts from the Affidavit of Agent Tully submitted in support of an order authorizing the interception of wire communications over the Franco Target Telephone, attached hereto as Exhibit B.

In summary, this case arose from a DEA wiretap on the telephone of a Ramon LNU, subsequently identified as Julio Franco, that began on Friday, November 7, 2003 and ended on Sunday, November 9, 2003. The wiretap on the Franco Target Telephone was based upon significant information developed prior to that time pursuant to numerous wiretaps regarding a large-scale cocaine and heroin importation conspiracy involving Colombian-based sources of supply who were communicating over cellular telephones with numerous U.S. based distributors. As noted below, the evidence developed during those wiretaps led to several large-scale cocaine seizures prior to the commencement of the Franco wiretap.

**The Colombian Investigation**

In May of 2003, the Colombian National Police ("the CNP") initiated an investigation into multiple cocaine and heroin trafficking organizations ("the Colombian Investigation"). Pursuant to that investigation, the CNP obtained an eavesdropping warrant on May 29, 2003 for a payphone used by the members of the different organizations (hereinafter "the COLOMBIAN PAYPHONE"). The CNP identified Paulino Salcedo, a resident of Medellin, Colombia, as a member of one of the organizations. Salcedo had previously been sentenced in 1995 to 36 months' imprisonment for conspiracy to distribute cocaine in Pennsylvania and thirty kilograms of cocaine were seized during that investigation. Based on his conversations with fellow DEA agents familiar with the Colombian investigation and his review of transcripts of certain

calls intercepted over the Colombian wiretaps between the Colombian targets and the targets in New York and Boston, Agent Tully learned the following: (a) SALCEDO organized and imported multiple kilogram shipments of cocaine and heroin from Colombia to the United States, via the Dominican Republic;  (b) he was assisted by GOMEZ, his associate in Colombia, and ARIAS, his associate in the Dominican Republic; and (c) ARIAS coordinated the transportation of the shipments from the Dominican Republic to the United States. The CNP intercepted a number of conversations over the COLOMBIAN PAYPHONE between SALCEDO and a narcotics trafficker in New York City in which SALCEDO arranged for the shipment of fifty kilograms of cocaine.

**The New York Investigation**

DEA New York identified the New York narcotics trafficker intercepted in the Colombian Investigation as MARCOS PENA ("PENA"), a resident of the Bronx, New York ("the New York Investigation"). DEA New York obtained court ordered authorizations on August 18, 2003 and August 29, 2003 to intercept communications over two cellular telephones used by PENA and his associates to conduct narcotics business (hereinafter "the NEW YORK CELLPHONES").  DEA New York then identified a cellular telephone used by SALCEDO to conduct narcotics business with PENA (hereinafter "the FIRST COLOMBIAN CELLPHONE").  The CNP obtained a court ordered authorization to intercept communications over that cellular telephone on September 12, 2003.  Later that same month, the CNP

intercepted a number of conversations over the FIRST COLOMBIAN
CELLPHONE between SALCEDO and PENA in which SALCEDO agreed to ship
one hundred kilograms of cocaine to PENA in New York, via Miami,
Florida.[1]  On October 22, 2003, in the vicinity of 131st Street and
Broadway in New York, New York, DEA New York seized four kilograms
of cocaine from one of PENA's customers, Ramon Almonte.  Almonte
had just received the cocaine from ANDREA NUNEZ, PENA's wife, and
LEYDA SELKOW, SALCEDO's point of contact in New York.  Almonte was
arrested and his case is pending in the Southern District of New
York.

### The Boston Investigation

#### a.   The Ramon Cell

The CNP also intercepted a conversation over the FIRST
COLOMBIAN CELLPHONE in September of 2003 between SALCEDO and a
narcotics trafficker in Boston, Massachusetts, identified as RAMON.
That call demonstrated that RAMON received multiple kilogram
shipments of cocaine from SALCEDO for distribution in the Boston
area ("the Boston Investigation").

Specifically, on September 26, 2003, at approximately 2:42
p.m., RAMON used the Target Telephone to call the COLOMBIAN
CELLPHONE, and spoke to SALCEDO.  During that conversation, SALCEDO

---

[1] As of the time of interceptions over the Target Telephone began, the
one hundred kilograms of cocaine had not been turned over to PENA or his
associates.  According to intercepted conversations, PENA and his associates
expected the transporters from the Dominican Republic to "front" them the
kilograms without payment, but the transporters expected payment of $4,000 per
kilogram up front.  The load was never released to PENA and his associates and
may have been distributed to another New York City area narcotics trafficker.

asked, "Do you like to go out with...with Henry or with Christina?"
RAMON replied, "With Christina."  SALCEDO said, "I'm giving things
out at 21ˢᵗ with 500ᵗʰ Avenue." RAMON said, "The most interesting
thing is... if they have beautiful legs and blond hair and all of
that."  SALCEDO said, "Yeah, yeah, she is, she is like... how can
I tell you, it's like Sophia Velgara."  RAMON said, "She needs to
look good, she needs to dance really well."  Based on his training
and experience, Agent Tully believed that SALCEDO's and RAMON's
references to  "Christina" were actually references to cocaine and
SALCEDO's references to "Henry" was actually a reference to heroin.
He further believed that SALCEDO's reference to his giving things
out at "21ˢᵗ with 500ᵗʰ Avenue" was  a reference to a price of
$21,500 per kilogram and was consistent with wholesale prices for
kilograms of cocaine in the Boston area.   That RAMON and SALCEDO
then discussed how good "Christina" looks and how well she dances
in the same conversation further reinforced his conclusion that
they were actually discussing cocaine, given his experience of
narcotics traffickers often discussing the quality of narcotics by
making reference to a woman's looks or how well she dances.   Thus,
when SALCEDO made a reference to "Sophia Velgara," a Colombian
model, when discussing what "Christina" looks like, Agent Tully
concluded that he was actually telling RAMON that the quality of
the cocaine was high.

Later in that same call, SALCEDO said, "We'll start you up
with five invitations to see...to see what you can do man, so we

break the ice." RAMON said, "We are now doing the collecting."
RAMON continued, "To be able to give you the papers." SALCEDO
asked, "Would you be able to give a down payments upon delivery,
when you give it the physical exam, can you ...?" RAMON replied,
"Yeah, yeah, yeah, of course." Based upon his training and
experience, Agent Tully believed that SALCEDO's reference to "five
invitations" was actually a reference to five kilograms of cocaine.
Based on the content of this call, Agent Tully believed that
SALCEDO proposed to first send five kilograms of cocaine to RAMON
to see if he could distribute them at the current price to his
customers. Agent Tully's belief that RAMON was preparing to
accept a shipment of cocaine from SALCEDO was reinforced by
SALCEDO's request for a down payment upon delivery. In his
experience, narcotics suppliers often distribute shipments of
narcotics on consignment, wherein a distributor picks up his
shipment of narcotics after making down payment and agreeing to pay
the balance of the narcotics debt within a short period, once he
distributes the shipment to his own customers. That RAMON was
going to give it a "physical exam" upon delivery further reinforced
his belief.

Still later in that same call, SALCEDO told RAMON to give him
his number and RAMON gave (617 818-0545, the telephone number
assigned to the Target Telephone, as a contact number. SALCEDO
said, I'll confirm things for tomorrow when they tell me that
everything is ready. I'll give you a call..."

Thus, even prior to the commencement of the Franco wiretap, agents had a significant basis to conclude that Ramon, subsequently identified as Franco, was a member of a wide-ranging cocaine importation and distribution conspiracy, and that the coded conversations he was engaged in over the telephones related to drug trafficking.

**THE FRANCO WIRETAP**

Shortly after initiating the wiretap on the Franco Target Telephone, T-Mobile number (617) 818-0545, DEA intercepted a call to Ramon from a male identified as Mingo who said "the Mexicans were coming the next day," that "it was a sure thing," and that they were bringing "six manos," which the agents interpreted, based on their extensive training and experience in both drug enforcement generally and wiretaps in particular, as thirty kilograms (six hands times five fingers per hand = 30). Ramon indicated that he would cancel his trip to the Dominican Republic the next day, and that everything was "all set up" there. Ramon and Mingo also discussed who they would be giving "it" to, referencing individuals identified as Manolo, Alexander, and Candelo. Mingo said the Mexicans would call him when they arrived.

Ramon and Mingo had another call shortly thereafter in which Ramon, in coded terms, discussed getting a "parking space for a car" (a storage place for the drugs) and added that no one had seen him "touch the car" which the agents interpreted as a reference to a car with a trap for the transportation of drugs and drug

proceeds. They also discussed how much Ramon had paid "Raffi" in the past "when we did the heavy stuff." Later that day, agents intercepted a number of calls during which Ramon attempted to collect money from his suspected customers.

Later that afternoon, agents set up surveillance outside Ramon's apartment at 11 Kings Hill Drive in Lynn, and observed a woman subsequently identified as Nancy Rios Franco, Ramon's wife, arrive at that address with a male subsequently identified as Jose Rafael Santiago, "Raffi," in a 1994 blue Audi registered to Santiago. Later that night, Ramon was observed arriving outside that location in a 1996 black Dodge Intrepid, MA registration 82 WA 04 registered to Julio Franco at 11 Kings Hill Drive, Lynn.

On Saturday, November 8, 2003, agents intercepted calls from various individuals asking Ramon when "it" would be arriving; as well as a call with Mingo in which he and Ramon discussed the logistics of the deal, and how much they would sell "it" for. At one point, when Ramon asked Mingo why it was taking so long, Mingo said the van was on its way and had "52 passengers," a coded reference, the agents believed, to 52 kilograms. Ramon also called his travel agency, identified himself as Julio Franco, and cancelled his trip to the Dominican Republic.

On Sunday, November 9, 2003, agents surveilled Franco traveling to an auto show. During that trip, Mingo called him and asked where Raffi was and said "these people are ready." Mingo told Ramon to get the money and come right away. Ramon was overheard

telling the passenger in his car that "we have to give almost 800 up front" which the agents interpreted as $800,000. Ramon then called Raffi, who was in Worcester, and told him to come to his house.  Ramon and Mingo has a subsequent call in which Mingo stated "we can't be carrying that shit" and they agreed to have Raffi go directly from Worcester to Providence to meet them.  In another call, Ramon told Mingo he already had "5 plus" in the "casuela" (trunk or trap) and could not fit anything else in it. They agreed they would leave some of the money in Boston.[2]

After these conversations, agents surveilled Ramon arrive back at 11 Kings Hill Road, enter a 1996 Volkswagen Jetta registered to another female, and drive away.  The agents lost Ramon, but intercepted conversations indicated that Ramon and Mingo met and exchanged vehicles, with Mingo taking the Jetta to Providence.  A Massachusetts State Police trooper stopped the Jetta as it was being driven southbound on Route 95 near the MA - Rhode Island border and obtained identifications for Domingo Vega, a/k/a "Mingo," who was driving, and Mark Osorio, a passenger.  The vehicle was allowed to leave after the traffic stop and was surveilled to Van Buren Street in Providence.

The driver and passenger were observed leaving the car and

---

[2] In addition, during the three day wire interception period, Franco and Vega had a number of conversations in which they discussed setting the price at between 25,000 and 30,000, again prices consistent with cocaine, and prior to initiation of the wire on Franco's telephone, Ramon was intercepted on a Colombian wiretap, as noted above, asking for "Christina" (code for cocaine) and not "Henry," (code for heroin).

entering an alley.  Shortly thereafter, several fire trucks arrived in the area, with lights flashing and horns blaring.  Agents observed a male leave the alley, enter the Jetta and drive away. Shortly thereafter, agents intercepted a call from Raffi to Franco in which he advised Ramon that Mingo had been followed, that something weird had happened, that Mingo didn't like what he saw and decided not to pick up the "clothes" and that Mingo had given Raffi the car to drive back to Boston.  Mingo also called Ramon and relayed the same information, indicating they had switched cars and left because the area was full of police.

As noted in the Tully Affidavit attached hereto as Exhibit C, the Jetta was stopped by a Rhode Island-based DEA agent, Keith Leighton, who activated his lights and siren.  He was assisted by a Massachusetts State Trooper, Kevin O'Neil, a deputized DEA Task Force agent, who pulled in front of the Jetta.  Other agents arrived at the scene momentarily, but they were all either DEA agents or deputized Task Force agents.  The driver of the car was identified as Jose Rafael Santiago.  The car contained over $529,000 in cash hidden under the rear seat in a trap, as well as a very explicit drug ledger including the names of Candelo, Alexander and Manolo, names identified as customers in previous calls between Ramon and Mingo. Santiago was placed under arrest.

Later that night, a Massachusetts State Trooper, acting at the direction of the DEA case agent Tully, stopped the 1994 blue Audi, registered to Santiago, in Massachusetts.  Vega was driving

the car and Osorio was a passenger in it. Vega and Osorio were arrested.  Santiago and Vega both had on their persons cellular telephones whose numbers matched those of the telephones Ramon had called Raffi and Mingo on during the prior two days.

Franco is a fugitive. Agents subsequently executed a search warrant at Franco's apartment and found another  $182,000 in cash hidden in a hide built into a wall accessed by going underneath the sink.  Another drug ledger was seized from Vega as he was attempting to rip it up and swallow it in his cell.  The drug ledger seized from the car with the money contains individuals names and amounts such as "27,000", "54,000", "81,000", "135,000", i.e, multiples of $27,000, which is consistent with the price for a kilogram of cocaine. The ledger seized from Vega had individuals names and amounts such as  "25,500' and "26,000" which are also consistent with a kilogram of cocaine.

### POINT ONE

### THE DEA AGENTS AND DEPUTIZED TASK FORCE AGENTS WHO STOPPED THE JETTA WERE AUTHORIZED TO STOP THE CAR IN RHODE ISLAND

As noted in the Affidavit of DEA Special Agent Tully, attached hereto as Exhibit C, the Jetta was stopped by a car driven by DEA Special Agent Keith Leighton, who pulled up behind the Jetta and activated his lights and siren. He was assisted by Massachusetts State Trooper Kevin O'Neil, a deputized DEA Task Force Agent, who pulled in front of the Jetta to make sure it did not escape.  As further noted in the Tully Affidavit, all the law enforcement

agents involved in the stop of the Jetta were either DEA Special
Agents or deputized DEA Task Force agents. As further noted in the
Affidavit, the DEA Task Force agents were deputized pursuant to 21,
U.S.C., § 878(a), which provides that:

> Any officer or employee of the Drug Enforcement
> Administration or any State or local law enforcement
> officer designated by the Attorney General may -
>
> (1) carry firearms;
>
> (2) execute and serve search warrants, arrest
> warrants, administrative inspection warrants,
> subpoenas, and summonses issued under the
> authority of the United States;
>
> (3) make arrests without warrant (A) for any
> offense against the United States committed in
> his presence, or (B) for any felony,
> cognizable under the laws of the United
> States, if he has probable cause to believe
> that the person to be arrested has committed
> or is committing a felony;
>
> (4) make seizures of property pursuant to the
> provisions of this subchapter; and
>
> (5) perform such other law enforcement duties as
> the Attorney General may designate.

Thus, both the DEA Special Agents and the Deputized DEA Task
Force agents were legally authorized to stop, search and seize the
Jetta in Rhode Island, arrest Santiago and seize the over $529,000
in cash found in the car. Accordingly, Santiago's motion to
suppress the Jetta stop on the ground that the Massachusetts State
Trooper lacked authority to make the stop in Rhode Island is
factually flawed in several respects, given that the car was
actually stopped by a Rhode Island based DEA Special Agent and
further given that all of the members of the team that participated

in the stop were either DEA agents or deputized DEA Task Force
agents. Furthermore, for these same reasons, the cases cited by
Santiago at pages 9-10 of his brief are inapposite, as they deal
with cases involving agents making arrests or seizures outside
their jurisdiction, which was not the case here, as the DEA and
deputized DEA Task Force agents were all authorized to make arrests
and seizures throughout the United States.

POINT TWO

THERE WAS AMPLE PROBABLE CAUSE TO STOP, SEARCH
AND SEIZE BOTH THE JETTA AND THE AUDI AND
ARREST SANTIAGO AND VEGA AND SEARCH THEIR PERSONS

Santiago argues that "the police lacked probable cause to
believe that evidence of a crime would be found in the motor
vehicle operated by the defendant. . . . It is not enough to
establish that the defendant had engaged in criminal activity. The
government must connect that activity to the particular  location
searched." (Memorandum of Law at 10-11.) In summary, Santiago
argues that the evidence obtained from the wiretap, in the form of
coded conversations, was not sufficient to support probable cause
to believe that a crime was being committed and that evidence of
the crime would be in the Jetta.   (Memorandum at 11-12). He also
argues that the money that was seized was not in plain view in the
Jetta. (Memorandum at 12).

Vega also argues that the agents lacked probable cause to stop
the blue Audi that he was driving back into Massachusetts and
arrest him, and that they lacked probable cause to search the Audi

for evidence. (Vega Memorandum of Law at 5-7 [pages unnumbered in brief]).

As noted in <u>United States v. Khounsavanh</u>, 113 F.3d 279, 283 (1st Cir. 1997), "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). The Court in <u>Khounsavanh</u> further noted that: "To establish probable cause for a premises search, the information available in the affidavit must show "a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Id</u>.(again quoting <u>Gates</u>, 462 U.S. at 238-39.

There was ample probable cause for the agents to believe that Franco, Vega and Santiago were engaged in a conspiracy to possess cocaine, that they attempted to further that conspiracy by transporting a large amount of cash in the Jetta to Providence in order to purchase a large quantity of cocaine, that their efforts to purchase the cocaine were frustrated when fire engines arrived on the scene and that they switched driver's and Santiago drove the car still containing the money back to Massachusetts after the drug deal was aborted.

Prior to intercepting conversations over the Target Telephone, agents had learned that Ramon, subsequently identified as Franco, was intercepted in clearly drug-related conversations with a Colombian based target, Salcedo, who was orchestrating the importation of cocaine and heroin into the United States. The

agent's belief that the coded conversations being intercepted over the target telephones were drug related were corroborated, in significant part, by the seizure of four kilograms of cocaine from one of Pena's customers in New York on October 22, 2003. Once interceptions over the Target Telephone began on November 8, 2003, agents almost immediately intercepted conversations in which Mingo, subsequently identified as Vega, advised Ramon, subsequently identified as Franco, that the "Mexicans were coming," that it was a "sure thing," and when Franco asked how much was coming Vega replied: "Six hands."  Franco's decision to cancel his trip to the Dominican Republic, combined with his conversations with Vega as to who they would give "it" to, and their references to using the car with a trap, all justified the agents interpretation that Franco and Vega were expecting approximately thirty kilograms of cocaine from a group of Mexicans.

Further support for the agent's probable cause to believe that Vega and Franco and Santiago were engaged in efforts to deliver a large sum of money in the Jetta to buy a large amount of cocaine include: Franco's discussions about collecting money; their discussions about selling it for prices ranging from 25,000 to 30,000, prices consistent in the agent's training and experience, with the price of a kilogram of cocaine, Franco's instruction to his wife to obtain a storage facility, the reference to a van with fifty two passengers (i.e., kilograms of cocaine) being o n its way, Franco's statement that "we have to give almost 800 up front"

(i.e., $800,000 in cash which would pay for more than approximately thirty kilograms of cocaine at the referenced price range of $21,500 per kilogram, Vega and Franco's discussion that the "stuff was already there", that "they can't be carrying that shit" and their decision to have Santiago travel from Worcester to bring back the drugs, Franco's statement to Santiago that he already had "five plus in the trap" (i.e., $500,000 in the hide in the car) and could not fit anymore in there, and their decision to make two trips, the fact that Franco switched the Jetta off to Vega to drive down to Providence, the intercepted calls after they were down there that the deal had not occurred because something weird happened so they did not " pick up the clothes," the surveillance of the defendant's activities while in Providence, as well as their decision to switch cars yet again and have Santiago drive the Jetta with the money back. All of this provided ample probable cause for the agents to stop the Jetta and the Audi, arrest the defendants and search and seize the cars and the money, documents, and telephones and pagers as evidence, fruits and instrumentalities of the crime of conspiracy to possess with intent to distribute cocaine.

Furthermore, given that probable cause existed to arrest Santiago and Vega, agents were entitled to conduct a search of the passenger compartments of vehicles that they were driving at the time of their arrests, regardless of whether there was independent probable cause to search the vehicles. See, e.g., United States v.

Belton, 453 U.S. 454 (1981). Moreover, given the evidence derived from the interceptions over the Franco Telephone that a large amount of cash was being transported in the Jetta, agents were entitled to stop and search the entire Jetta without a warrant, and independent of a search incident to arrest of Santiago, pursuant to the well-settled automobile exception to the warrant requirement. See, e.g., United States v. Ross, 456 U.S. 798, 804-09 (1982); Chambers v. Maroney, 399 U.S. 42, 44 , 52 (1970)(warrantless search of car valid where police had probable cause to believe car contained evidence of service station robbery); United States v. Cleveland, 106 F.3d 1056, 1062 (1st Cir. 1997)( officer had probable cause to conduct warrantless search of vehicles because one car followed another to rendezvous with third vehicle and because there was an exchange of personnel between vehicles).

Similarly, after making valid arrests of the defendants, the agents were entitled to conduct a search of their persons, incident to arrest, regardless of whether there was probable cause to believe contraband or evidence or fruits of criminal conduct would be found on their persons. See, e.g., New York v. Belton, supra; Michigan v. DeFillippo, 443 U.S. 31, 35 (1979); United States v. Robinson, 414 U.S. 218 (1973).

Santiago cites a number of cases for the proposition that it is not enough for the government to establish that the defendant was engaged in criminal activity, it must also connect the activity to the location searched. (Brief at 11). However, in this case, as

noted above, the agents, having probable cause to stop the Jetta and arrest Santiago, were entitled to search the passenger compartment of the car even absent probable cause to believe that evidence would be found there.

Furthermore, the cases cited by Santiago are unavailing. For example, United States v. Genao, 281 F.3d 305, 308 (1st Cir. 2002) upheld a search warrant for an apartment based on a CI drug buy in that apartment; United States v. Baldyga, 233 F.3d 674, 683 (1st Cir. 2000) upheld a search warrant for drug dealer's property outside his house, based on three CW buys of drugs from him, and evidence of drug dealing, but no drugs, found pursuant to prior search of his house; Jacobs v. City of Chicago, 215 F.3d 758, 770 (7th Cir. 2000), involved a Section 1983 action brought by residents of an apartment searched by police and held that officers with search warrant for house erroneously described as single-family residence, improperly conducted warrantless search of second floor apartment for which there was absolutely no evidence of any illegal drug trafficking (in contrast to the instant case where there was ample evidence of drug trafficking; United States v. Khounsavanh, 113 f.3d 279, 283 (1st Cir. 1997), upheld a search warrant based on cooperating witness information and one controlled purchase. Thus, none of these cases contained facts even remotely similar or analogous to the instant case or otherwise supportive of Santiago's position.

In addition, the cases cited by Santiago in support of his

argument that Agent Tully's interpretation of the intercepted
conversations "were little more than guesswork" (Memorandum of Law
at 11) are also inapposite. <u>United States v. Dukagjini</u>, 326 F.3d
45, 52 (2d Cir. 2003) upheld the admissibility of a DEA agent's
expert testimony regarding coded jargon used by drug dealers in
intercepted wiretap conversations; while <u>United States v. Peoples</u>,
250 F.3d 630, 640-642 (8th Cir. 2001) upheld the admissibility of
lay opinion testimony by an officer regarding similarities and
possible relationship between four robberies.

Finally, neither defendant cites even a single case involving
wiretap conversations used, in part, to establish probable cause
for the arrest of a defendant and the stop and search of vehicles
involved in drug transaction.

Accordingly, for all of the foregoing reasons, the government
respectfully submits that the DEA agents and deputized Task Force
agents had more than sufficient probable cause to believe that
Santiago, Vega, Franco and others were involved in collecting and
transporting to Rhode Island a large sum of cash to buy drugs; that
the sum was so large that it would require two trips to transport
it; that, because of the criminal nature of their conduct, Franco
and Vega instructed Santiago to meet them down there where he was
clearly intended to be the person to drive the car containing the
cocaine, once they purchased it, back to Massachusetts; that the
drug transaction was aborted when the defendants sensed law
enforcement surveillance, and fire engines arrived on the scene for

unrelated reasons; and that Santiago was told to drive the Jetta back to Massachusetts precisely because it still contained this large amount of cash; and that agents had probable cause to stop and arrest Vega and Santiago at that point, had the right to search the defendant's persons and the passenger compartments of both the Jetta and the Audi as searches incident to arrest, and they had the separate right to search both vehicles based on probable cause to believe that the vehicles contained evidence of criminal conduct, including money in the case of the Jetta.

Wherefore, the United States respectfully requests that the court deny both defendant's motions to suppress evidence in their entirety and without a hearing, given that there are no legitimate factual issues in reasonable dispute requiring such a hearing.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: _____
KEVIN P. MCGRATH
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

Suffolk, ss.                    Boston, Massachusetts
                                June 1, 2004

I, KEVIN P. MCGRATH, Assistant U.S. Attorney, do hereby certify that I have served the copy of the foregoing, by first class mail, to: Charles Clifford, Esq., 305 Main Street, Charlestown, MA, 02129, and Joseph Machera, Esq., 220 Beach Street, Revere, MA 02151.

_____
KEVIN MCGRATH
Assistant U.S. Attorney